IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

| | | |
|---|---|---|
| JAMES NELSON FINCH, et. al., | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action File No. |
| | ) | 2:10-CV00062 WCO |
| vs. | ) | |
| | ) | |
| DONALD SHANE BROWN, in his | ) | |
| individual capacity, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST DEFENDANT DONALD SHANE BROWN

COME NOW the plaintiffs and respectfully submit this memorandum of law in support of their motion for summary judgment as to liability against Donald Shane Brown.

## I.

## INTRODUCTION AND SUMMARY OF ARGUMENT

This wrongful death action is brought by the Estate of Ricky Finch and by his three sons.  On November 12, 2008, Ricky G. Finch committed suicide in a cell at the Jackson County Jail by hanging himself with a makeshift noose fashioned from his personal socks.

Plaintiffs sue Donald Brown for his deliberate indifference to the risk of suicide which he knew existed concerning Ricky Finch, and for his breach of his ministerial duty to conduct surveillance checks of Ricky Finch and to record such checks. For and upon the uncontradicted facts presented, and upon the argument set forth in this Memorandum, Plaintiffs are entitled to entry of Summary Judgment against Defendant Brown as to his liability upon Plaintiffs' Fourteenth Amendment deliberate indifference claim and upon their state law based negligence claim.

## II.

## STATEMENT OF FACTS

Ricky G. Finch was taken into custody at the Jackson County Jail during the mid-afternoon hours of November 12, 2008. (Phillip Radford Stanley Dep. 68, Nov. 1, 2010 [hereafter "Stanley Dep."].) Finch had been arrested by a City of Arcade police officer on charges of public drunk and open container, among other charges, and had entered the jail in an intoxicated state. (Krista Lynn Clark Dep. 36, Nov. 3, 2010 [hereafter "Clark Dep."]; SMF Attachment "B" [Arrest/Booking Report, FINCH – 198].)[1]

---

[1] Unless otherwise indicated, all exhibits referenced in this memorandum of law are also attached to Plaintiffs' Statement of Material Facts As to Which There is No Genuine Issue to be Tried and therefore bear the same "SMF Attachment" citation format and attachment letter as that contained in Plaintiffs' Statement of Material Facts.

Finch was booked into the jail at around 19:02 hours.  (Clark Dep. 34; SMF Attachment "C" [Radio Operator's Log, FINCH – 293].)  By this time, a new shift of officers had started working at the jail, including Officers Krista Clark and Philip Radford Stanley, a defendant in this action.  (Clark Dep. 33; Donald Shane Brown Dep. 26, Nov. 1, 2010 [hereafter "Brown Dep."]; Chad Herbert Dep. 9, Nov. 3, 2010 [hereafter "Herbert Dep."].)  Defendant Donald Shane Brown was assigned to the cellblocks during this shift.  (Clark Dep. 30-31; Brown Dep. 26.)  As the jail's cellblock officer, Defendant Brown had sole responsibility for conducting suicide watches.  (Clark Dep. 30-31; Raymond Gailey Dep. 38, Dec. 7, 2010 [hereafter "Gailey Dep."].)

Clark was Finch's book-in officer.  (Brown Dep. 26; Clark Dep. 7.)  During the book-in process, Officer Clark interviewed Finch using a standard medical questionnaire form.  When Finch told her that he "wanted to hurt himself," (Clark, 42-46), Clark marked on the form that Finch was a suicide risk.   (SMF Attachment "D" [Medical Questionnaire, FINCH – 193].)  Clark also indicated that Finch suffered from other medical problems, including "depression, stomach problems, and acid reflux."  (SMF Attachment "D" [Medical Questionnaire, FINCH – 193].)

Clark notified the shift supervisor, Deputy Stanley, who was then acting sergeant, that Finch was a suicide risk.  (Clark Dep. 50.)  The code "10-44" went

3

up next to Finch's name on a dry erase board inside the book-in office.  (Brown

Dep. 38-39, 53; Clark Dep. 64; Stanley Dep. 43.)  10-44 is the "ten-code"

employed by the Jackson County Sheriff's Office to indicate that an inmate is a

suicide risk.  (Clark 48-49; Brown Dep. 39; Affidavit of Cpt. David Savage ¶ 5,

attached to Plaintiffs' Statement of Material Facts and hereafter referred to as

"Savage Aff.".)

     Defendant Brown was in the book-in area.   Both Clark and Stanley

informed Brown that Finch was a suicide risk.  (Brown Dep. 37, 49; Stanley Dep.

53.)  Brown knew that Finch had been designated as 10-44. (Brown Dep. 38-39,

53.)  Brown also saw Finch's medical questionnaire form – the form on which

Clark indicated that Finch posed a risk of suicide.  (Brown Dep. 37.)

     Defendant Brown's first and last in-person encounter with Finch – at least

before Finch committed suicide – came while Finch was still in the book-in area.

(Brown Dep. 34-35.)  A standard, jail issue "property box" had been sitting just

outside of the shower room as Finch took his shower and dressed out in prison

attire.  (Clark Dep. 54-55; Herbert Dep. 18-19.)  Brown knew that this property bin

contained items which were potentially harmful to a suicidal inmate, including a

towel, a sheet, and a blanket.  (Brown Dep. 51; Stanley Dep. 103.)

     After Brown saw Deputy Herbert escort Finch to the segregation cell,

Acting Sergeant Stanley instructed Brown to start a suicide watch on Finch.

(Stanley Dep. 53.)  Separate and apart from Stanley's verbal directive, Brown had the specific responsibility to conduct suicide watches that night, by virtue of his assignment as cellblock officer.  (Brown Dep. 34; Clark Dep. 30-31; Stanley Dep. 57.)

According to the jail's standard operating procedure in effect at that time, once an inmate is placed on suicide or 10-44 watch, the officers responsible for conducting the suicide watch are required, among other things, to perform the following tasks:

- Remove from the inmate all his civilian clothing and personal belongings;

- Place the inmate in a suicide smock;

- Assign and house the inmate in a segregation or strip cell;

- Conduct in-person visual and verbal checks on the inmate at intervals of at least every 15 minutes; and

- Log each in-person check of the inmate on an official watch log.

(Savage Aff. ¶ 4; *see also* Brown Dep. 43, 48, 95; Clark Dep. 27-28; Stanley Dep. 100, 139; SMF Attachment "E" [Clark-Wimpy Interview Tr., FINCH – 106-107]; SMF Attachment "H" [Brown-Wimpy 11/17/2008 Interview Tr., FINCH – 83-84].)

On the night of Finch's death, Brown knew he was required under jail policy to make in-person visits to Finch's cell every 15 minutes at the time Finch was

placed on suicide watch. (Brown Dep. 43, 48, 95; SMF Attachment "H" [Brown-Wimpy 11/17/2008 Interview Tr., FINCH – 83-84]; SMF Attachment "N" [GBI 11/21/2008 Investigative Summary, FINCH – 270].) Brown also understood that prisoner threats of suicide had to be taken "seriously" and the suicidal inmate considered "sincere." (Brown Dep. 22-23.) When asked whether there were "any circumstances under which it [would be] safe for a jailer not to take a threat of suicide seriously," Brown answered: "Not that I know of." (Id. at 22:25-23:18.)

With regards to Ricky Finch in particular, Brown considered Finch's threat of self-harm to be serious and recognized that Finch posed a risk of suicide. (Id. at 49.) Moreover, Brown never had any reason to think that the risk of suicide had passed. (Id. at 48-49.)

Despite his duty to monitor Finch, and his concrete knowledge of the risk of suicide, Brown completely ignored Finch. From the time Finch was escorted to his cell to the time he was discovered dead by the deputies – a period of well over an hour – Brown did not conduct a single in-person check on Finch. (Id. at 44.)

If Brown had only conducted the in-person checks every 15 minutes, he would have interrupted Finch and would have been able to prevent the suicide. The video of Finch's death reflects that Finch spent approximately 21 minutes engaged in the specific actions directed to trying to hang himself. During this period of time, Finch wrapped his socks into a noose; he tied this makeshift noose

to his metal bunk bed frame; and, he wrapped the noose around his neck twice.  At one point during this 21-minute interval, Finch hung loosely from the noose for almost five (5) minutes (the first suicide attempt).  (<u>See generally</u> SMF Attachment "K" [Seg. Cell Video], at 21:07 to 21:47:03.)    If Brown had made even one  in-person check on Finch's cell during this period, he would have at least seen the noose made of socks dangling from Finch's bed frame. (Brown Dep. 94.)  As a result of Brown's failure to perform his duties, Finch was able to methodically fashion his noose and commit suicide, uninterrupted and undetected.

Finch hung lifeless for about 38 minutes until officers Clark and Stanley rushed into his cell.  (SMF Attachment "K" [Seg. Cell Video], at 21:47:03 to 22:25:27.)  Brown's first in-person appearance at Finch's cell, as shown in the video, came at 21:26:23 hours,[2] about 1 hour and 19 minutes after Finch was first placed into segregation cell one, and about half-an-hour after Finch hung himself, fatally, the second time.  (<u>Id.</u> at 21:07 to 22:26:23.)

When Brown was summoned to respond to Finch's cell, he knew in his mind that Finch might indeed have committed suicide.  (Brown Dep. 55-56.)   When Brown arrived at the cell,  Stanley looked up at Brown and instructed him to "make sure the log is completed before everybody gets here."  (Brown Dep. 62;

---

[2] 22:26:23 is the actual time stamp on the video, which is one hour ahead of the actual time because the video surveillance system had not been adjusted to reflect daylight savings time.  <u>See</u> Pls.' Statement of Material Facts 18 n.1.

Clark Dep. 86-87.)  Brown then rushed back to the book-in area, found a blank watch sheet, and filled it out with falsified time entries in an effort to cover up what was his total failure to make a single in-person check on Finch.  (Brown Dep. 68.)  Brown knew that he was doing something wrong by filling out the watch sheet but decided to do it anyway.  (Id. at 74:20-75-7.)

Brown looked "panicked,"  (Herbert Dep. 27.) as he wrote out the fabricated watch log, telling Deputy Herbert that "we are in trouble" and we "could lose our jobs."  (Id. at 27-28.)  Shortly afterwards, EMS personnel arrived and pronounced Finch dead on scene.  (Stanley Dep. 126.)

## III.

## ARGUMENT AND CITATION OF AUTHORITIES

### A.   BROWN LIABLE FOR HIS DELIBERATE INDIFFERENCE TO FINCH'S RISK OF SUICIDE

#### 1.   Legal Standard for Claims of Deliberate Indifference

Pretrial detainees such as Ricky Finch are protected by the Due Process Clause of the Fourteenth Amendment to the United States Constitution.  Bell v. Wolfish, 441 U.S. 520, 535 (1979).   As a result, pretrial detainees are guaranteed the same level of "basic necessities" as they would by virtue of the Eighth Amendment's prohibition against "cruel and unusual punishment."  Hamm v. Dekalb County, 774 F.2d 1567, 1574 (11th Cir. 1985).  One such "basic necessity" is the provision of adequate "medical care" to a pretrial detainee.  Id.  As the court

in <u>Hamm</u> stated: "The standard in regard to medical care in determining a violation of the eighth amendment is <u>deliberately indifferent</u>.  The standard to measure the state's duty under the due process clause for pretrial detainees for medical care can equally and fairly be measured by the same standard."  <u>Id.</u>

"Because jail suicides are analogous to the failure to provide medical care, deliberate indifference has become the barometer by which suicide cases involving … pretrial detainees are tested."  <u>Popham v. City of Talladega</u>, 908 F.2d 1561, 1563 (11th Cir. 1990) (citations omitted).  In such a scenario, a jail official will have violated a pretrial detainee's due process rights if he exhibited "deliberate indifference" to the inmate's taking of his own life.  <u>Snow ex rel. Snow v. City of Citronelle</u>, 420 F.3d 1262, 1268 (11th Cir. 2005) (citation omitted).  <u>See also</u> <u>Tittle v. Jefferson County Comm'm</u>, 10 F.3d 1535, 1539 (11th Cir. 1994) ("Deliberate indifference, in the context of a jail suicide, is a question of whether a defendant was deliberately indifferent to an individual's mental condition and the likely consequences of that action").

The key inquiry in adjudicating a jailer-defendant's liability in a section 1983  "deliberate indifference" action is whether the official "had subjective knowledge of a risk of serious harm and disregarded that risk by conduct that constituted more than mere negligence."  <u>Gish v. Thomas</u>, 516 F.3d 952, 954 (11th Cir. 2008) (citing <u>Snow</u>, 420 F.3d at 1268).  In this regard and consistent with the

demands of due process, a plaintiff "need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a <u>substantial risk</u> of serious harm." <u>Farmer v. Brennan</u>, 511 U.S. 825, 842 (1994) (emphasis added).[3], [4]

The Eleventh Circuit has made it clear that, "[w]here prison personnel directly responsible for inmate care have knowledge that an inmate has attempted, or even threatened, suicide, their failure to take steps to prevent that inmate from committing suicide can amount to deliberate indifference.  <u>Greason v. Kemp</u>, 891 F.2d 829, 835-36 (11th Cir. 1990) (citations omitted)

### 2.    Brown's "Deliberate Indifference"

### a. Subjective Knowledge of Risk of Suicide

The first prong of the deliberate indifference standard is met in this case. Bworn had direct, subjective knowledge that Finch posed a ubstantial risk of suicide.  He saw the code "10-44" go up next to Finch's name on the dry erase

---

[3] While <u>Farmer</u> concerned a claim of deliberate indifference by a convicted person under the Eighth Amendment's prohibition of cruel and unusual punishment, its reasoning applies with equal force to cases, like the one here, involving deliberate indifference claims brought by pretrial detainees.  <u>See, e.g.</u>, <u>Bozeman v. Orum</u>, 422 F.3d 1265, 1272 (11th Cir. 2005) (applying <u>Farmer's</u> subjective state of mind requirement to a pretrial detainee's deliberate indifference claim and finding a violation of the detainee's due process rights).

[4] It is notable that the <u>Farmer</u> Court went out of its way to dispel the belief that this subjective knowledge component would allow prison officials to be "free to ignore obvious dangers to inmates" and, in doing so, endorsed the use of "circumstantial evidence" and the inferences drawn from such evidence as a means with which to satisfy the subjective knowledge component of a deliberate indifference claim.  <u>Id.</u> (citation omitted).  <u>Accord</u> <u>Hale v. Tallapoosa County</u>, 50 F.3d 1579, 1583 (11th Cir. 1995).

board in the jail's book-in office; he knew that this signified that Finch constituted a suicide risk.  (Brown Dep. 24, 38-39, 41, 53, 66.)[5]  Brown was told by Deputies Clark and Stanley that Finch had threatened to harm himself as he was being processed book-in.  (Brown Dep. 37, 49; Stanley Dep. 53.)  Brown checked on Finch's medical questionnaire (Brown Dep. 37) where Clark had noted Finch as a risk of suicide.  Brown knew all of this information at the time that he saw that Finch was being placed into the isolation cell where inmates designated as suicide risks are generally housed.  (Brown Dep. 36.)  Brown understood Finch's threat of self-harm to constitute a "substantial risk." Farmer v. Brennan, 511 U.S. at 842.

Once having learned that Finch was suicidal, the clear risk of Finch's suicide never lessened.  No one ever suggested to Brown that Finch was no longer a suicide risk, (Brown Dep. 49), and Brown himself never changed his own assessment that Finch remained suicidal.  (Id.)

### b. Brown Responded to the Suicide Risk With Deliberate Indifference

The second prong of evidence required to demonstrate deliberate indifference involves an evaluation of how the defendant reacted to the risk of injury known by the defendant.   The second prong asks whether the defendant

---

[5] While the record appears conflicted as to whether Brown or Clark, Finch's book-in officer, had actually written the "10-44" code, (see Clark Dep. 48-49), there is no dispute that Brown had personal knowledge of this official identification of Finch as a suicidal inmate at the time Finch was booked-in to the jail (Brown Dep. 38-39, 41, 53, 66).

disregarded the risk by conduct that constituted more than mere negligence.  <u>Snow</u>

<u>ex rel. Snow v. City of Citronnelle, Ala.</u>, 420 F.3d 980, 986 (11th Cir. 2003).

As the jail's cellblock officer, it was Brown's responsibility to conduct

suicide watches.  (Brown Dep. 34; Clark Dep. 30-31; Gailey Dep. 38; SMF

Attachment "E" [Clark-Wimpy Interview Tr., FINCH – 108].)   Nevertheless,

Brown did not bother  - not even once – to check in on Finch until Finch was long

dead.  Despite his direct responsibility to check in on Finch, he did not do so for

the entire one hour and eighteen minute time span from when Finch was placed in

the isolation cell to when he was discovered dead.  Brown failed completely to

check on him every 15 minutes, as mandated by the jail's suicide watch protocol,[6]

even though he knew jail protocol required that inmates on suicide watch had to be

checked, in-person, at 15-minute intervals.  (Brown Dep. 43, 48, 95; SMF

Attachment "H" [Brown-Wimpy 11/17/2008 Interview Tr., FINCH – 83-84]; SMF

Attachment "N" [GBI 11/21/2008 Investigative Summary, FINCH – 270].)

The facts supplied to this Court are more than sufficient to compel a finding

of deliberate indifference on the part of Brown.  <u>See, e.g.</u>, <u>Snow ex rel. Snow</u>, 420

F.3d at 1270 (reversing grant of summary judgment for jailer-defendant on

---

[6] Under the jail's 15-minute, in-person surveillance policy, Brown would have had at least five separate opportunities during this span of time in which to observe Finch as he prepared his makeshift noose, tied it to his bed frame, and twice attempted to hang himself.  Brown himself testified that, had he done the required in-person checks, he "would have" at the very least seen the socks hanging from Finch's bed frame.  (Brown Dep. 94.)

deliberate indifference claim where the jailer-defendant "did nothing" after learning that the decedent inmate posed a serious risk of suicide, omissions which included failing to inform other officers that inmate was a suicide risk and failing to remove items from decedent inmate's cell which posed a threat a self-harm).

Brown's attempt to cover up his failure to carry out the 15 minute watch on Finch is further evidence of Brown's knowledge that he had been indifferent to the risk of Finch's suicide. Once he saw Finch's lifeless body lying on the floor of his isolation cell, Brown ran back to the book-in area and falsified a watch log to make it appear as if he had conducted the required 15-minute, in-person checks on Finch, when, in fact, he did not do so. (Brown Dep. 65, 68; SMF Attachment "H" [Brown-Wimpy 11/17/2008 Interview Tr., FINCH – 84].)[7] He knew that he was doing something wrong by falsifying the log but still decided to do it anyway. (Brown Dep. 68, 74-75; Attachment "H" [Brown-Wimpy 11/17/2008 Interview Tr., FINCH – 89].)[8]

As was the case in <u>Snow</u>, supra., in the face of concrete information by which he understood that Finch posed a direct threat of suicide, Deputy Brown took no action whatsoever to safeguard Finch. Brown "deliberately did not take

---

[7] At least one court has found such a practice of "pencil whipping" or "logging that cell checks had been done when they had not" would support a finding of deliberate indifference liability in the jail suicide context. <u>Estate of Abdollahi v. County of Sacramento</u>, 405 F. Supp. 2d 1194, 1207 (E.D. Cal. 2005).

[8] Officer Herbert, who was present in the book-in area while Brown falsified the watch sheet, testified in his deposition that Brown appeared "panicked" and complained to him (Herbert) that "we are in trouble" and that "they could lose their jobs." (Herbert Dep. 27-28.)

any action" to prevent Finch's suicide. The second prong of evidence needed to

demonstrate "deliberate indifference" is fully satisfied, and this Court must

conclude that Brown's conduct constituted a violation of Finch's Fourteenth

Amendment right to due process.

Brown's  conscious disregard of the suicide threat to Finch, and of his

obligations to conduct a suicide watch, resulted in  Finch's death. See LaMarca v.

Turner, 995 F.2d 1526, 1538 (11th Cir. 1993) (stating in an Eighth Amendment

deliberate indifference case that "section 1983 'requires proof of an affirmative

causal connection between the actions taken by a particular person 'under color of

state law' and the constitutional deprivation") (citations omitted). The surveillance

video recording of Finch's segregation cell, the accuracy of which cannot be

reasonably disputed, shows that Finch began making a noose out of his socks at

21:26:00 hours and that he died a few minutes after 21:47:03 hours when Finch

made his second and ultimately successful suicide attempt – a period of over 20

minutes. (SMF Attachment "K" [Seg. Cell Video], at 21:26:00 to 21:51:55; SMF

Attachment "R" [GBI 11/20/2008 Investigative Summary, FINCH - 267] ("At

approximately 2[1]:53 hours, all movement stopped with inmate Ricky Finch");

see also Brown Dep. 93 (agreeing to 25 minute time period).)  Not only did Brown

concede that he could have seen Finch's makeshift noose hanging from the bunk

during this period of time had he properly performed the 15-minute, in-person

14

checks on Finch, but, in addition, he agreed that he could have prevented Finch's

suicide entirely.  (Brown Dep. 94-95.)

**B.     BOTH DEPARTMENTAL POLICY AND SUPERVISOR DIRECTIVE REQUIRED FORMER DEPUTY BROWN TO CONDUCT 15 MINUTE IN PERSON CHECKS ON SUICIDE RISK PRISONERS SUCH AS FINCH; FAILURE TO ADHER TO SUCH DIRECTIVES BREACHED A MINISTERIAL DUTY**

**1.     Legal Standard**

The Georgia Constitution "provides no immunity [to public officials] for

ministerial acts negligently performed." Gilbert v. Richardson, 264 Ga. 744, 753 (1994).

As the Supreme Court recently reiterated:

> A ministerial act is commonly one that is simple, absolute, and definite, arising under conditions admitted or proved to exist, and requiring merely the execution of a specific duty. [emphasis supplied – ed.] A discretionary act, however, calls for the exercise of personal deliberation and judgment, which in turn entails examining the facts, reaching reasoned conclusions, and acting on them in a way not specifically directed.

Murphy v. Bajjani, 282 Ga. 197, 199 (2007) (citing Leake v. Murphy, 274 Ga.

App. 219, 221 (2005), and Leake v. Murphy, 284 Ga. App. 909 (2005)) (emphasis

supplied).  See also Common Cause/Georgia v. City of Atlanta, 279 Ga. 480, 482-

483 (2005); Standard v. Hobbs, 263 Ga. App. 873, 875 (2003); Joyce v. Van

Arsdale, 196 Ga. App. 95, 96 (1990).

The determination of whether specific acts are ministerial or discretionary is

not formalistic, but rather depends on the character of the complained of act, rather

than the general character of the public official's job responsibilities, and on all relevant facts of the particular case.  See, e.g., Woodard v. Laurens County, 265 Ga. 404, 407 (1995); Nelson v. Spalding Co., 249 Ga. 334, 336 (1982); Guthrie v. Irons, 211 Ga. App. 502, 504 (1983).

A number of decisions have held specific duties of public officials to be ministerial, such that official immunity was not warranted.  See, e.g., Heller v. City of Atlanta, 290 Ga. App. 345, 347-49 (2008), aff'd sub nom., Georgia Dep't of Transp. v. Heller, 285 Ga. 262 (2009) (Atlanta police department employee failed to properly inspect vehicle tires); Clive v. Gregory, 280 Ga. App. 836, 841-43 (2006), aff'd, 282 Ga. 476 (2007) (building inspector failed to conduct required inspection); Meagher v. Quick, 264 Ga. App. 639, 642 (2003) (police officers failed to complete report required by law); Happoldt v. Kutscher, 256 Ga. App. 96, 98-99 (2002) (county inspector failed to inspect roadway); Joyce, 196 Ga. App. at 96-97.

Where a governmental employee is required by existing policy to take specific acts under defined circumstances or is otherwise directed to perform a specific act in the course and scope of their employment, the failure to carry out the act called for is a breach of ministerial duty. While the act of establishing a policy in the first place is discretionary, the acts of following established policies are ministerial tasks.  Woodward, 265 Ga. at 407; Joyce, 196 Ga. App. at 96.

Similarly, where a governmental employee has been instructed to perform a particular task by their supervisors, "the execution of a specific task is characterized as ministerial even though the manner in which it is accomplished is left to the employee's discretion." <u>Id.</u> at 97.  <u>The task to be performed need not be in writing so long as the task is the subject of a specific directive</u>.  For example, in <u>Joyce v. Van Arsdale</u>, the County Commission had instructed Van Arsdale, the County Road Superintendent, to take the necessary steps to close certain bridges. He then delegated the responsibility to another county employee.  The directive did not come in the form of a written policy or procedure.  Simply stated, it was a direction that under the circumstances, a particular task was to be performed.   The Court concluded that the duties of a supervisor of road work "in carrying out the physical details of the work are likewise ministerial in nature." <u>Id.</u> at 97.

## 2.     Brown's Breach of His Ministerial Duties Established By Jail Policy

The first issue presented is whether Brown's duty to follow established departmental procedure concerning the monitoring of prisoners on a suicide watch was a ministerial rather than discretionary duty.  Georgia courts have held that a county jailer's duty to follow "established policies and procedures which govern[ed] the surveillance of inmates" is a ministerial duty and that the failure to follow such procedure constitutes a breach of a ministerial duty.  <u>Harvey v. Nichols</u>, 260 Ga. App. 187, 192 (2003).

In <u>Harvey v. Nichols</u>, the parents of a seventeen year old decedent brought a wrongful death action against detention officers following their son's suicide death.   In rejecting the jailers' claim to "official immunity" from suit due to what the defendants claimed was the "discretionary" character of the jailer duties, the Court reasoned that:

> The Newton County Jail had established policies and procedures which governed the surveillance of inmates.  All prisoners were to be observed on a regular basis, the frequency of observation depending on whether the prisoner was housed in an observation cell, a holding cell, or the general population.  "While the act of establishing a policy in the first place is discretionary, the acts of following established policies of inspecting and monitoring are ministerial tasks." Carter, supra at 417.  The actions of [the jailers], dictated as they were by established procedure and requiring merely the execution of a specific duty, were ministerial in nature.

<u>Id.</u> at 192-93 (citation omitted).

In <u>Clark v. Prison Health Services</u>, 257 Ga. App. 787, 789 (2002), the mother of a seventeen year old man who committed suicide in the Chatham County jail brought a wrongful death suit against several staff members at the jail, including a classification officer and floor officers having the duty to inspect and monitor prisoners.   The court reversed the entry of summary judgment for a classification officer because certain of his "allegedly negligent actions were governed by clear, definite, and certain procedures or instructions."   <u>Id.</u> at 792. Similarly, and of particular application in guiding this Court regarding former Deputy Brown's liability, <u>the appellate court</u> ~~sustained~~ expressly endorsed ~~the trial~~

court in the finding trial court's finding that (a) "jail polices concerning inspecting and monitoring of inmates [are] ministerial acts" and (b) the negligence of an officer in failing to abide by such policies voids any defense of official immunity and requires the imposition of liability.  The Court of Appeals also agreed with the trial court "that in floor **officers who failed "…to follow jail policies concerning inspecting and monitoring of inmates were ministerial acts.  [The appellate court agreed] that in**specting the cells in the unit according to the [a] prescribed schedule and documenting detainees' location and status required merely the implementation of clear and certain duties, not the exercise of personal judgment." Id. at 793 (citing Carter v. Glenn, 249 Ga. App. 414, 417 (2001)).

In the case now before this Court, Brown was assigned to the duty of cellblock officer on the night of Finch's death.  Brown Dep. 26; Clark Dep. 30-31.) As cellblock officer, it was his duty to follow specific policies concerning the monitoring of suicidal prisoners.  (Brown Dep. 43, 48, 95; SMF Attachment "H" [Brown-Wimpy 11/17/2008 Interview Tr., FINCH – 83-84]; Savage Aff. ¶ 5.) Both Brown and the other on-duty officers knew full well that cellblock officers had the duty to perform suicide watches.  (Brown Dep. 34; Clark Dep. 30, 31; Gailey Dep. 38.)

Jackson County Sheriff Departmental Policy required that when a prisoner was is placed on suicide watch, they were to be checked in person and with verbal

checks at intervals of at least every 15 minutes.  (Brown Dep. 43, 48, 95; Savage Aff. ¶¶ 4, 5.)  The Department's written policy concerning in-person surveillance of inmates (SOP No. 3.8), as identified by Jail Commander David Savage in paragraph five of his affidavit, directed that:  "inmates who are suicidal … or recovering from intoxicants shall receive in person surveillance of at least every 15 minutes," and "[e]ach in person surveillance is to be documented in the daily log." (SMF Attachment "I" [Jackson County Jail Policy No. 3.8, FINCH – 526-527]; Savage Aff. ¶ 5.)  Moreover, the jail's official watch sheet on which Brown was supposed to have logged his in-person checks of Finch required that Brown "write what the inmate is doing/physically and verbally check [the] inmate."  (SMF Attachment "F" [Disciplinary Watch Sheet, FINCH – 346].)  Even though Brown failed to adhere to this directive, he acknowledged that no one, including Stanley, had the authority to override the requirements of verbal/physical checks contained on the form.  (Brown Dep. 46.)

Brown was well aware that the jail policy required that inmates on suicide watch be physically checked every 15 minutes and that those checks were to be logged.  (Brown Dep. 43, 48, 98.)  Nevertheless, disregarding explicit departmental policy, Brown never conducted an in person check on Finch at any time before Finch was discovered dead.  (Id. at 44.)  According to the surveillance video recording tape of Finch's segregation cell, Finch he entered the segregation cell at

21:07 hours.  (SMF Attachment "K" [Seg. Cell Video], at 21:07.)   After the passage of an hour and eighteen minutes, alone and unmonitored, Finch was found hanging.

Brown's knowledge of his responsibility to have monitored Finch on a regular basis is borne out by the fact that in the immediate aftermath of the discovery of Finch's dead body, Brown raced to the book-in area of the jail to write a fabricated watch log in which he falsely "documented" that he had conducted the in--person 15 minute checks on Finch prior to Finch's death. (Brown Dep. 68.)

The law is clear that The the following of established policies of inspecting and monitoring prisoners, in addition to the documentation of such inspections, are ministerial tasks.  Harvey, 260 Ga. App. at 192; Clark, 257 Ga. App. at 789. Brown's failure to conduct the requisite monitoring and documentation not only breached an obvious ministerial duty, but it demonstrably lead to Finch's death. As acknowledged by Brown, he could have prevented Finch's death if he had checked on Finch as required by departmental protocol.  (Brown Dep. 95:2-20.)

### 3.    Brown Breached His Ministerial Duties When He Disregarded a Direct Order From His Supervising Officer

The next issue presented is whether Deputy Stanley's direction to Brown to regularly check on Finch in the isolation cell constituted an order to carry out a ministerial act.

Georgia decisional law provides that where a governmental employee is specifically directed to carry out a particular task, then the duty to perform the task constitutes a ministerial duty.   <u>Joyce</u>, 196 Ga. App. at 97 (1990) (county commission instructed employee to close certain bridges; the duty to perform that task was ministerial not discretionary, even where the commission did not also direct the particular way to complete the task).   <u>See also</u> <u>Lincoln County v. Edmond</u>, 231 Ga. App. 871, 874 (1998) (employee's "discretion" in how a tree would be removed did not change the fact that the tree must be removed).   ÷<u>Miree v. United States</u>, 490 F. Supp. 768, 772-75 –(1980) (O'Kelley, J.) (airport manager's obligation to warn visiting airmen of bird hazard was a ministerial duty even though manager exercised discretion in other areas of his job).

The facts presented reflect that Deputy Stanley was Brown's superior officer on the night that Finch died.  (Brown Dep. 90.)  By operation of the principle of "chain of command" Brown had the duty to follow the orders given to him by superior officers, including Stanley.  (<u>Id.</u> at 15, 16.)    Stanley verbally informed Brown that Finch was a suicide risk, (<u>Id.</u> at 37.) and  instructed Brown to start a suicide watch on Finch.  (Stanley Dep. 52.)  Stanley specifically instructed Brown to carry out 15 minute watches on Finch; it was a direct order from Stanley to Brown.  (Stanley Dep. 78:15.)

Under controlling law, a ministerial duty on the part of a government employee arises upon the employee's receipt of a specific order to carry out a specific task. <u>Miree</u>, 490 F. Supp. at 774-75. Having been given the order by Stanley, Brown's duty to carry out the order cannot be characterized as "discretionary." "[I]mplicit in the conclusion that an act [is] discretionary is the notion that the official was free to perform or disregard the act." <u>Id.</u> at 775. Brown was not "free" to disregard carrying out Stanley's direct order; he was required to follow it. Therefore, this Court can only conclude that Brown's failure to comply with Stanley's order to carry out 15 minute checks on Ricky Finch constituted a breach of a ministerial duty.

"Whether the acts upon which liability is predicated are ministerial or discretionary is determined by the facts of the particular case." <u>Brown v. Taylor</u>, 266 Ga. App. 176, 177 (2004). The question of whether a governmental employee is entitled to official immunity is a question of law that must ultimately be decided by the trial court. <u>Outlaw v. Nasworth</u>, 250 Ga. App. 362 (2001). Plaintiffs urge this court to determine, as a matter of law, that former Deputy Brown's obligation to perform the 15 minute in person observations of Ricky Finch was directed both by established departmental policy and by a direct order from Brown's supervisor, and that such duty was a ministerial duty and not one for which Brown may assert the defense of "official immunity."

## <u>CONCLUSION</u>

For and upon the foregoing, Plaintiffs pray that this Court enter Partial

Summary Judgment as to liability against Defendant Brown upon Plaintiffs'

claims that Brown violated the 14th Amendment by his deliberate

indifference to Finch's risk of suicide and that Brown negligently failed to

carry out his ministerial duty to perform surveillance checks, all resulting in

the death of Ricky Finch.


                    S/ Brian Spears, Esq.
                    Brian Spears, Bar No. 670112
                    Attorney for Plaintiffs James N. Finch
                    and The Estate of Ricky Finch and
                    Plaintiff Jason O. Finch

1126 Ponce de Leon Avenue
Atlanta, GA 30306
404-872-7086

                    S/ Albert Wan, Esq.
                    Albert Wan, Bar No. 334224
                    Attorney for Plaintiffs James N. Finch
                    and The Estate of Ricky Finch and
                    Plaintiff Jason O. Finch

1201 Peachtree Street
400 Colony Square, Suite 200
Atlanta, GA 30361
404-872-7760

                    S/ Gary Shapiro, Esq.
                    Gary Shapiro, Bar No. 637794
                    Attorney for Plaintiff Justin Finch

400 Galleria Parkway
Suite 1500-20
Atlanta, GA 30339

770-431-1500

## CERTIFICATE OF SERVICE

I hereby certify that on February 23, 2011, I electronically filed the attached with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to the following attorneys of record:

Andrew H. Marshall, Esq.
Begnaud & Marshall, LLP
1091-B Founders Boulevard
Post Office Box 8085
Athens, Georgia 30603-8085

G. Kevin Morris
Williams, Morris & Waymire, LLC
Building 400, Suite A
4330 South Lee Street, NE
Buford, Georgia 30518

Timothy J. Buckley
Michaela Kendall
Buckley & Brown, PC
2970 Clairmont Road, Suite 1010
Atlanta, GA 30329

Albert Wan, Esq.
1201 Peachtree St., Ste. 200
Atlanta, GA 30361

Gary M. Shapiro, Esq.
400 Galleria Parkway, Suite 1500-20
Atlanta, GA 30339

S/BRIAN SPEARS, ECF-Registered Attorney
Georgia Bar No. 670112
Attorney for Plaintiffs
1126 Ponce de Leon Avenue
Atlanta, GA 30306
Telephone: (404) 872-7086
Email: Bspears@mindspring.com